05-6142-cr
*United States v. Habbas*

**UNITED STATES COURT OF APPEALS**
**FOR THE SECOND CIRCUIT**

August Term, 2007

(Argued: September 28, 2007                    Decided: May 30, 2008)

Docket No. 05-6142-cr, 06-0427-cr

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

UNITED STATES OF AMERICA,

*Appellee*,

v.

FAWAZ HABBAS and MOHAMED RAHMAN,

*Defendants-Appellants*.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

Before: LEVAL and SACK, *Circuit Judges*, GARAUFIS, District Judge.[*]

Defendants, Fawaz Habbas and Mohamed Rahman, appeal from judgments of conviction in the United States District Court for the Eastern District of New York (Gleeson, *J.*). Each contends that his Guidelines range was incorrectly calculated and that his sentence was not reasonable. Rahman contends, in addition, that the government breached its plea agreement, and that he received ineffective assistance of counsel. Affirmed.

---

[*] The Honorable Nicholas G. Garaufis, United States District Judge for the Eastern District of New York, sitting by designation.

1

ROGER BURLINGAME, Assistant United States Attorney, United States Attorney's Office, Eastern District of New York, Brooklyn, New York (David C. James and Roslynn R. Mauskopf, United States Attorney for the Eastern District of New York, on the brief), for *Appellee*.

JAMES H. FELDMAN, JR., Law Offices of Alan Ellis, Ardmore, Pennsylvania (Peter Goldberger and Alan Ellis, on the brief), for *Appellant* Mohamed Rahman.

Barry S. Turner, Law Office of Barry S. Turner, New York, New York, for *Appellant* Fawaz Habbas.

LEVAL, *Circuit Judge*:

Defendants Fawaz Habbas and Mohamed Rahman appeal from judgments of the United States District Court for the Eastern District of New York (Gleeson, *J.*). Rahman pled guilty to obstructing a federal grand jury investigation. 18 U.S.C. § 1512(c)(2), (j). Habbas pled guilty to a similar charge of obstructing a federal grand jury investigation, and also to conspiracy to make false statements to U.S. government officials, 18 U.S.C. § 371, and making false statements to a government official. 18 U.S.C. § 1001(a)(2). The charges were based on defendants' participation in a conspiracy to frame another person, falsely accusing him of an assault that the defendants and their co-conspirators had in fact staged. We affirm the judgments of the district court.

## BACKGROUND

Defendants Rahman and Habbas conspired to frame Mohamed Abdel-Wahed. The victim, Abdel-Wahed, had earlier testified against Rahman in an unrelated proceeding. To retaliate against Abdel-Wahed, the defendants organized an elaborate conspiratorial plan,

involving a number of co-conspirators and a simulated assault on co-conspirator Nadia Zeid, who later pled guilty and admitted her role in the plot.

Zeid had recently testified in a murder trial against one Mohamed Khalil. The conspirators devised a plan to make it appear that Abdel-Wahed assaulted Zeid to punish her for testifying against Khalil. Zeid lay in the street, bleeding. A co-conspirator (Angelo Gordon), pretending to be an unrelated passerby, called 911 and flagged down a passing police car to report having witnessed an assault on Zeid, and gave a description of Abdel-Wahed as the assailant. Rahman and Habbas had previously conducted surveillance of Abdel-Wahed's daily routines, and planned the simulated assault to occur near where Abdel-Wahed would be found. As planned by the conspirators, the police arrested Abdel-Wahed based on Gordon's report and description. Both Gordon and Zeid identified Abdel-Wahed as the assailant, and Zeid stated that he did it to punish her for testifying against a fellow Egyptian. Based on the identification by Gordon and Zeid, Abdel-Wahed was arrested, charged with a crime carrying a life sentence, and held in custody for seven weeks pending his trial. Eventually, he was released when Habbas informed authorities that the crime was bogus and that Abdel-Wahed had been framed.

Habbas and Rahman both pled guilty after providing detailed accounts of their crimes. Habbas was sentenced to a prison term of twenty-seven months, two years of supervised release and a special assessment of $300. Rahman was sentenced to a prison term of eight years, a three year term of supervised release, and a $100 assessment.

Rahman raises three issues on appeal. He contends, first, that the government breached his plea agreement by supporting a higher Guidelines level than the government had estimated in his plea agreement; second, that his counsel's failure to object to a four-level upward adjustment

3

of his Guidelines range constituted ineffective assistance of counsel; and third, that his sentence of eight years imprisonment was unreasonable.

Habbas raises four issues. He contends that the district court erred in, first, imposing a three-level increase for substantial interference with justice; second, refusing to adjust his Guidelines level downwards by reason of a minor role; third, not granting a downward departure; and, fourth, imposing a sentence which violated 18 U.S.C. § 3553(a) because it was "greater than necessary" to achieve the objectives of sentencing.

## DISCUSSION

### A. Rahman

#### I. Breach of Plea Agreement

Rahman argues that once the government, following our suggestion in *United States v. Pimentel*, 932 F.2d 1029 (1991), provided an estimate of the Sentencing Guidelines range in his plea agreement, it was not at liberty to argue in support of a more onerous guidelines analysis than it had estimated, at least absent new information not in the government's possession at the time of the estimate.

In *Pimentel*, in the early days of sentencing under the United States Sentencing Guidelines, we noted that we were "troubled by the escalating number of appeals from convictions based on guilty pleas in which the appellant claim[ed] that he was unfairly surprised by the severity of the sentence imposed under the Guidelines. In particular, we note[d] the distressingly large number of appeals involving defendants indicted for drug offenses who, at the time of tendering their pleas, were apparently unaware of the quantity of drugs that could be included in calculating their base offense levels." *Id.* at 1032. We expressed sympathy with the

4

recurring claims that defendants "did not fully appreciate the consequences of their pleas." *Id.* We therefore urged the government in making plea agreements to provide estimates to defendants of their likely Guidelines range to help "ensure that guilty pleas indeed represent intelligent choices by defendants." *Id.* at 1034. We recognized that the government had no "legal obligation to provide this information." *Id.*

The government in this case followed our suggestion in *Pimentel* and set forth in Rahman's plea agreement its estimate of "the likely adjusted offense level" of 16, resulting in a Guidelines range of 27 to 33 months. In so doing, the government however included language clearly indicating its intention and reservation of right to seek a sentence higher than the Guidelines range. It clearly stated that its "estimate . . . is not binding on the [United States Attorney's] Office, the Probation Department or the Court." The agreement went on to say that "the government reserves the right to argue for a sentence beyond that called for by the Guidelines based on the factors set forth in 18 U.S.C. § 3553(a)." It specified that the defendant could not withdraw his plea, even if the Guidelines level "advocated by the [United States Attorney's] Office, or determined by the Probation Department or the Court" is "different from the estimate." And it specified further that defendant could not appeal so long as the sentence did not exceed 60 months, which was far in excess of the government's estimated range.

When the Presentence Report ("PSR") was prepared by the court's probation office after Rahman's guilty plea, it recommended a four-level upward adjustment under U.S.S.G. § 3B1.1(a) by reason of the defendant's leadership role in criminal activity that involved five or more participants. In its *Pimentel* estimate set forth in the plea agreement, the government had not included this adjustment. The sentence range recommendation in the PSR was therefore

5

higher than the range that had been estimated by the government in the plea agreement. At the sentencing hearing, the government supported the four-level increase recommended by the PSR, and maintained that its own failure to include this upward adjustment in the earlier *Pimentel* estimate had been a "mistake." The district court determined that the adjustment under § 3B1.1(a) was appropriate, and calculated the proper Guidelines level as 20, providing a Guidelines range of 41 to 51 months. In considering the mandatory sentencing factors detailed in 18 U.S.C. § 3553(a), however, the court concluded that Rahman's crime was "outside the heartland," was an "absolutely outrageous manipulation, distortion of the processes of this justice system," and called for a considerably more severe sentence than the 51 month maximum under the Guidelines range. The court thus imposed a sentence of eight years imprisonment.

Rahman contends that the government's support of the four-level increase recommended by the PSR was a breach of the plea agreement. We disagree. Upon full consideration of the particular facts of this case, we reject Rahman's argument that the government violated his rights under the plea agreement by advocating a higher Guidelines level than it had estimated in the plea agreement. Our conclusion is supported by a number of factors. These include that the plea agreement clearly stated that the range set forth was merely a non-binding estimate, and warned in several different ways that the government was likely to advocate for a higher sentence. Further, there is no suggestion that the government acted in bad faith, either by intentionally low-balling its initial estimate, intending to increase it subsequently, or in its subsequent advocacy of a higher range. Finally, it appears that Rahman was not harmed by the government's change of position.

We recognize that notwithstanding recitations of liberty to seek a higher sentence (and

6

even a declaration of intention to do so), in certain circumstances government deviation from its prior estimate could conceivably produce serious unfairness. This might be so, for example, where the change of position involved bad faith or where the government's change of position (without new justifying facts) changed the defendant's exposure so dramatically as to raise doubts whether the defendant could reasonably be seen to have understood the risks of the agreement. *See, e.g.*, *United States v. Griffin*, 510 F.3d 354, 365-66 (2d Cir. 2007) (finding breach of plea agreement). Nothing of the kind was present in this case. *See United States v. Amico*, 416 F.3d 163, 167-68 (2d Cir. 2005) ("mild, non-provocative, merely informative, and substantially justified" comment by the government contrasted with "egregious facts" of *United States v. Vaval*, 404 F.3d 144 (2d Cir. 2005)). There has been no suggestion that the government in any way acted abusively or in bad faith either in its initial estimate or in the subsequent reevaluation. Nor did the government reverse its position regarding the applicability or effect of a particular provision, upsetting a reasonable reliance by the defendant on the government's stated position. It appears in this case that, under the pressures of preparing a *Pimentel* estimate after the defendant indicated readiness to plead, the government simply failed to notice the possible applicability of § 3B1.1(a).

Finally the defendant suffered no prejudice resulting from the government's eventual decision to support the PSR recommendation of a four-level increase under § 3B1.1(a). The court understandably found that the heinous cynicism and cruelty of defendant's crime called for a sentence of nothing less than eight years, which was far in excess of the range resulting from the four-level addition. The court noted that the dispute about the Guidelines was "academic." The government's support for the four-level increase proposed by the Probation Department thus had

no effect on the ultimate sentence.

Rahman's argument relies heavily on our decision in *United States* v. *Palladino*, 347 F.3d 29 (2d Cir. 2003). He contends *Palladino* established a rule that, absent new justifying facts not known to the government at the time of its *Pimentel* estimate, the government is forbidden from advocating or supporting a higher level than it estimated. This misreads *Palladino*. The holding of *Palladino* depended on its particular facts, which were substantially different from the facts herein. *Palladino* did not purport to adopt such a broad rule.

In *Palladino*, the defendant had signed a plea agreement, in which the initially assigned Assistant United States Attorney estimated an adjusted offense level of 10; the defendant pled guilty to transmitting a threat in interstate commerce (18 U.S.C. § 875(c)). *Id*. at 30-33; U.S.S.G. § 2A6.1(a) (base offense level). After the plea, in preparing the PSR, the probation officer considered whether to recommend a six-point upward adjustment for "conduct evidencing an intent to carry out [the] threat." U.S.S.G. § 2A6.1(b)(1). The probation officer decided against recommending the increase, finding that it was not supported by the evidence. *Palladino*, 347 F.3d at 31. The case was reassigned to a new Assistant United States Attorney, who apparently took a more aggressive view of the case than the originally assigned Assistant. In an effort to persuade the probation officer to recommend the increase, the new Assistant transcribed a tape recording of the defendant's incriminating statements, of which the government had all along been aware. This stratagem persuaded the Probation Office to change its position and to recommend the increase. *Id*. The new Assistant then wrote a letter to the district court arguing in favor of this upward adjustment and successfully renewed the argument at the sentencing hearing. *Id*. "*In the circumstances presented in this case*," our court most appropriately concluded, "we

believe that *defendant had a reasonable expectation* that the Government would not press the Court for an enhanced offense level in the absence of new information." *Id.* at 34 (emphasis added).

The *Palladino* opinion emphasized repeatedly that it was a narrow holding addressed to the circumstances before it. The critical circumstances included importantly the court's sense that the government's new advocacy for the upward adjustment resulted from the transfer of responsibility to a new Assistant United States Attorney, who took a more aggressive view than the Assistant who had handled the defendant's plea. *Cf. Santobello v. New York*, 404 U.S. 257, 262 (1971) (violation of plea agreement found when new prosecutor breached the promise made by previous prosecutor). The potential for unfairness was aggravated by the fact that the plea agreement specified that the government would not move for an "upward departure" or even make a recommendation "within the Guidelines range." *Palladino*, 347 F.3d at 32. Having agreed neither to advocate a specific sentence nor an upward departure, the government nonetheless engaged in aggressive advocacy of a higher offense level. These circumstances led the district court to note the defendant's "surprise," *id.,* and this court persuasively found on appeal that the understandable surprise violated the "spirit" of the agreement. *Id.* at 30. We found that "[a]t the very least, the plea agreement was ambiguous as to whether the Government could justifiably pursue the enhancement sought in this case." *Id.* at 34; *see also, e.g.*, *United States v. Khan*, 920 F.2d 1100, 1105 (2d Cir. 1990) (applying "implied obligation of good faith and fair dealing" to plea agreement). The ambiguity found in the *Palladino* agreement is not present here. To the contrary, Rahman was given clear warning that the government planned to advocate a sentence above the originally estimated Guidelines range. The most important circumstances which

9

persuasively support the *Palladino* decision are not present here.

We reject the defendant's contention that *Palladino* established a broad rule, categorically prohibiting the government from deviating from a *Pimentel* estimate, absent newly discovered facts. Each case tuns on its facts, and the number of significant variables potentially in play in such an inquiry is enormous. We think it would be foolhardy to attempt to set a broad rule, beyond noting the obvious importance of good faith on the government's part. On the present facts, we find no basis for doubting the government's good faith. Nor do we find other reasons to prohibit a good-faith revision of the original estimate.[1]

---

[1] We are mindful of the government's dilemma and of the potential for unfair surprise to the defendant when a *Pimentel* estimate is later changed. The government furnishes estimates, although not obligated by law to do so, in response to this court's suggestion in *Pimentel* that such estimates would protect defendants from unfair surprise after pleading guilty. While it is obviously not ideal for the government to overlook an applicable guideline adjustment when making its estimate, it is understandable that such a mistake can happen in good faith. The Guidelines are long and complex, and *Pimentel* estimates are generally made in haste when the possibility arises to dispose of a case through a plea agreement. If the government perceives that it risks being barred from good-faith revisions because it accommodated defendants by furnishing good-faith (but not foolproof) estimates, it will likely cease to furnish estimates, and the fairness of the system to defendants will suffer.

In *Palladino*, the plea agreement expressly stated that the *Pimentel* estimate was "based on information known to the government." It was undisputed that the information, which the government claimed as justification for its change of position, had been known to the government at the time of its *Pimentel* estimate. *Palladino*, 347 F.3d at 33. In an effort to protect its ability after *Palladino* to deviate in good faith from an earlier estimate, the government in this case chose to delete from its *Pimentel* estimate the words "based on information known to the government." We respectfully suggest that this was not the best approach to solving the problem.

The words, "based on information known to the government," or other words communicating the same thought, serve the important purpose of clarifying the government's freedom to advocate for a higher guideline range when its change of position is based on its *subsequent* acquisition of aggravating information. The problem in *Palladino* was not that those words appeared in the *Pimentel* estimate, but rather the combination of the passages of the plea agreement conferring assurance that the government would not advocate for a sentence higher than the estimate, with the aura of unfair dealing that underlay the government's change of

10

II. Ineffective Assistance of Counsel

Rahman's counsel at the time of sentencing did not object to the four-level upward adjustment recommended by the PSR under U.S.S.G. § 3B1.1(a) by reason of the defendant's leadership role in criminal activity that involved five or more participants. Rahman contends that his counsel was constitutionally ineffective in failing to object. The question of ineffective assistance is determined by a two-part test. A defendant must demonstrate "(1) that counsel's performance was so unreasonable under prevailing professional norms that counsel was not functioning as the counsel guaranteed the defendant by the Sixth Amendment; and (2) that counsel's ineffectiveness prejudiced the defendant such that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *United States v. Gaskin*, 364 F.3d 438, 468 (2d Cir. 2004) (citing *Strickland v. Washington*, 466 U.S. 668, 668, 687, 694 (1984)) (internal citations and quotation marks omitted).

Rahman's claim of ineffective assistance cannot succeed because he cannot show prejudice. Rahman's claim thus fails under the second part of the *Strickland* test because the

position. Based on our reading of *Palladino*, we very much doubt that the result of that case would have changed if, all else remaining the same, those words had not appeared in the *Pimentel* estimate. By the same token, the reasoning of the *Palladino* panel strongly suggests it would have reached the opposite result, and would have accepted the change of position, notwithstanding the words "based on information known to the government," if the change had resulted from a good-faith, understandable oversight made under pressure to produce a plea agreement with a *Pimentel* estimate.

We believe the government would be better advised to retain words clarifying its right to change its position on the basis of new information not yet known to the prosecution, and to warn as clearly as possible that the furnishing of a *Pimentel* estimate will not bar the government from making good-faith changes to its position, even as to information already in its possession, if, for instance, further study shows the applicability of guideline provisions not considered in making the estimate.

11

district court made it clear that this dispute about the Sentencing Guidelines was "academic." The dispute was academic because the district court reasonably believed that the sentencing range produced by the Guidelines was inadequate for the crime and thus departed upward to a sentence of eight years. It made no difference whether counsel objected to the four-level adjustment. Rahman suffered no prejudice.

III. Reasonableness of the Sentence

Rahman contends his sentence was unreasonable. He argues three reasons. First, Rahman contends that the district court did not "consider" the Guideline range. Second, the district court's reasons for the sentence were "not supported by any factual basis in the record." Third, the district court "did not explain why it believed a sentence [higher than the guidelines range] was necessary."

We find no basis for his contentions. The court did consider the Guidelines range, although deciding for good reason that it did not provide sufficient punishment for so horrendous, cruel and despicable a crime. The court's reasons for the sentence were well supported by the facts of record, and the court explained the need for a sentence above the Guidelines range.

B. Habbas

Habbas challenges the overall reasonableness of his sentence under the "parsimony" clause of 18 U.S.C. § 3553(a), and makes three objections to the way his sentence was calculated under the Guidelines.

Habbas's contention that his sentence of twenty-seven months violated 18 U.S.C. § 3553(a) because it was "greater than necessary" to serve the objectives of sentencing is frivolous. As described above, this horrendous crime, designed to inflict cruel devastation on the life of the victim, appropriately merited a sentence far above the Guidelines range. Habbas, nonetheless,

12

received a twenty-seven month sentence, which was *within* the Guidelines range. The only reason that the district court did not depart upward was because of Habbas's cooperation. We find no merit to Habbas's contention that the sentence was higher than necessary to serve the objectives of sentencing.

Habbas objects to the three-level increase under U.S.S.G. § 2J1.2, because his case involved a "substantial interference with the administration of justice." The commentary to the Guidelines states that "'[s]ubstantial interference with the administration of justice' includes . . . an indictment . . . based upon . . . false testimony, or other false evidence." U.S.S.G. § 2J1.2, cmt. n.1 (2005). Habbas's crime falls directly within the plain meaning of this Guideline rule.

Habbas contends that, under U.S.S.G. § 3B1.2(b), he should have been awarded a two-level downward adjustment because he only played a "minor role," one analogous to a driver or a courier in a drug transaction. Habbas himself acknowledges that he "recruited" a member of the conspiracy. His role was greater than that of a courier. The district court was within its discretion in rejecting Habbas's contention that he warranted a minor role adjustment.

Finally, Habbas argues that the court erred in refusing to depart downward by reason of his cooperation with the government in the prosecution. The government submitted a motion pursuant to U.S.S.G. § 5K1.1 detailing the substantial assistance that Habbas provided. The district court, however, declined to depart below the Guidelines range, explaining that it was because of Habbas's cooperation that the court did not depart upward, as it had done in the case of Rahman. Even though the sentence was within the Guidelines range, Habbas received ample credit for his cooperation, which resulted in a substantially lower sentence than he otherwise would have received. There was no error, much less abuse of discretion.

For the foregoing reasons, the judgments of the District Court are hereby AFFIRMED.

13