17-1896-cr
*United States v. Walker*

**UNITED STATES COURT OF APPEALS**

**FOR THE SECOND CIRCUIT**

August Term, 2018

(Argued: December 12, 2018     Decided: April 4, 2019)

Docket No. 17-1896-cr

_____

UNITED STATES OF AMERICA,

*Appellee*,

− v. −

TYRONE WILSON, AKA BISCUIT, AKA YOUNG BRICKY, JOSEPH GARCIA, AKA JO JO, MUSA MARSHALL, AKA SLIM, CRYSTAL LEWIS, AKA EBB, VERDREEA OLMSTEAD, AKA AUNTIE, JOSEPH RANDOLPH, AKA RIZZLE, JOSEPH VALENTIN, AKA J., TYHE WALKER, AKA G.I.B., AKA GUY IN THE BUSHES, ALGENIS CARABELLO, AKA HIGH-HENNY, JORGE MEJIA, AKA MOOSE, AKA MUSSOLINI, RONALD HERRON, AKA RA, AKA RA DIGGS, AKA RA DIGGA, AKA RAHEEM,

*Defendants*,

SHONDELL WALKER, AKA M-DOT,

*Defendant-Appellant*.

_____

Before: JACOBS, CALABRESI, *Circuit Judges*, RAKOFF, *District Judge*.[*]

---

[*]Judge Jed S. Rakoff, of the United States District Court for the Southern District of New York, sitting by designation.

Appeal from the judgment of the United States District Court for the Eastern District of New York (Garaufis, *J.*) sentencing Defendant Walker to 360 months in prison and five years of supervised release for a single count of conspiring to distribute at least 200 grams of crack cocaine in violation of 21 U.S.C. § 846. Walker pled guilty in October 2011 pursuant to a plea agreement in return for an estimated sentence of 108 to 135 months in prison. The District Court, at the Government's request, then postponed Walker's sentencing hearing while a trial proceeded against Walker's co-defendant. After that trial concluded, Walker's sentencing hearing was held in May 2017. At the hearing, the Government asked for a significant sentence increase based in part on information that arose during the co-defendant's trial but which the Government knew about at the time it negotiated Walker's plea agreement. The District Court accepted the Government's new estimate and sentenced Walker to 360 months in prison. We now vacate Walker's sentence. We hold that the Government breached Walker's plea agreement when the Government, based on information that it knew at the time of the plea, sought a substantially higher sentence than that estimated in Walker's plea agreement. Accordingly, we VACATE Walker's sentence and REMAND the case to a different district court judge for resentencing under Walker's plea agreement.

———————————————

JILLIAN S. HARRINGTON, Monroe Township, NJ (Martin J. Siegel, *on the brief*, New York, NY), *for Defendant-Appellant*.

RENA PAUL, Assistant United States Attorney (Richard P. Donoghue, United States Attorney for the Eastern District of New York, Amy Busa, Samuel Nitze, David Lizmi, Assistant United States Attorneys, *on the brief*), Brooklyn, NY, *for Appellee*.

———————————————

GUIDO CALABRESI, *Circuit Judge*:

This case presents the question of whether the Government breaches a plea agreement when it agrees to an estimated sentence—known as a "*Pimentel* estimate"—in a defendant's plea bargain, then advocates for a substantially higher sentence at the defendant's sentencing hearing on the basis of information known to the Government at the time of the agreement.

We have previously held that allegations of breached plea agreements depend on what "the reasonable understanding and expectations of the defendant [were] as to the sentence for which he had bargained." *Paradiso v. United States*, 689 F.2d 28, 31 (2d Cir. 1982) (per curiam). Here, Defendant-Appellant Shondell Walker agreed to a *Pimentel* estimate of 108-135 months' imprisonment when he pled guilty in 2011, and the Government agreed that it would not deviate from this estimate in the absence of new information. Walker's sentencing hearing was then delayed for six years, in substantial part due to the Government's request that sentencing be postponed while a trial proceeded against a co-defendant. At the end of this trial, the Government sought several sentencing enhancements based on information that became evident during trial but which the Government knew about at the time it

3

negotiated Walker's plea deal. Ultimately, the Government argued that Walker ought to be sentenced to 360 months to life in prison.

We hold that, under these circumstances, Walker could not have reasonably expected that the Government would change its position in such a manner when he consented to the *Pimentel* estimate in his plea bargain, and therefore that the Government breached the plea agreement. Accordingly, we VACATE Walker's sentence and REMAND for resentencing under the original plea agreement.

## BACKGROUND

On October 5, 2010, pursuant to a surveillance operation conducted by the New York Police Department ("NYPD") and the Drug Enforcement Agency ("DEA"), defendant Shondell Walker and two others were arrested during a traffic stop.

That same day, the Government filed a criminal complaint against Walker in the United States District Court for the Eastern District of New York. The complaint stated that "[f]or the past several years, the NYPD and the DEA have been investigating a violent criminal organization based in the Gowanus Houses, a public housing development in the Boerum Hill section of Brooklyn." Compl. ¶ 2. "For the better part of the last three years, these defendants have controlled the

4

distribution of crack cocaine and heroin in the Gowanus Houses." *Id.* ¶ 2.

"During the course of this investigation, law enforcement has, among other things, made numerous undercover purchases of crack cocaine directly from members of this crew." *Id.* ¶ 3. "In addition, . . . NYPD has executed various search warrants and arrested various individuals associated with this organization. These search warrants . . . have resulted in the seizure of . . . substantial quantities of crack cocaine . . . ." *Id.* ¶ 4.

The complaint explained that Walker was "regularly involved in the distribution of crack cocaine in the Gowanus Houses for an individual identified as Ronald Herron, who was the leader of this criminal organization." *Id.* ¶ 6 (capitalization and footnotes removed). Walker "worked with this organization and served as one of Herron's primary security guards and enforcers." *Id.* ¶ 7. For instance, Walker would "regularly accompany Herron to narcotics transactions and carry firearms for Herron." *Id.* ¶ 7. "Walker would also help to protect Herron's narcotics territory . . . by, for example, robbing or attacking rival narcotics traffickers." *Id.* ¶ 7. And one cooperating witness "stated that he and Walker participated in a shooting against a rival narcotics trafficker." *Id.* ¶ 7. Moreover, Walker had previously been arrested in association with this criminal

organization when he was discovered in an apartment where the NYPD also found heroine and crack cocaine. *Id.* ¶ 5.

Walker and eleven other co-defendants were eventually charged in a multi-count indictment for participation in the Gowanus Houses drug conspiracy.

On October 6, 2011, Walker pled guilty—pursuant to a plea agreement with the Government—to a single count of conspiring to distribute at least 200 grams of crack cocaine in violation of 21 U.S.C. § 846. In turn, the Government "estimate[d] [Walker's] likely adjusted offense level under the Guidelines to be level [29], which is predicated on the following Guidelines calculation:" (1) a base offense level of 30 points derived from the 200 grams of crack cocaine distribution, *see* U.S.S.G. §§ 2D1.1(a)(5), (c)(5); (2) a 2-point enhancement for possession of a weapon based on a firearm recovered from the vehicle during Walker's arrest, *see id.* § 2D1.1(b)(1); and (3) a 3-point reduction for acceptance of responsibility, *see id.* §§ 3E1.1(a), (b). App. 90-91. This resulted in an estimated Guidelines sentence of 108-135 months.

The plea agreement also stated, in relevant part:

> 3. The Guidelines estimate set forth . . . is not binding on the Office, the Probation Department or the Court. If the Guidelines offense level

6

advocated by the Office, or determined by the Probation Department or the Court, is, for any reason, including an error in the estimate, different from the estimate, the defendant will not be entitled to withdraw the plea and the government will not be deemed to have breached this agreement.

. . .

5. The Office agrees that . . . based upon information now known to the Office, it will . . .
   b. take no position concerning where within the Guidelines range determined by the Court the sentence should fall; and
   c. make no motion for an upward departure under the Sentencing Guidelines.

If information relevant to sentencing, as determined by the Office, becomes known to the Office after the date of this agreement, the Office will not be bound by paragraphs 5(b) and 5(c).

App. 91-93.

The Probation Department subsequently prepared a Pre-Sentence Report ("PSR") for Walker on January 3, 2012, in which it agreed with the Government's estimated Guidelines sentence. According to the PSR, Walker worked as an "enforcer" for the conspiracy and "carried a firearm as part of his role in the organization in order to protect himself, the drug proceeds, and the locations on the block where the crack cocaine was sold." PSR ¶ 11. The PSR also reported that, "[p]er the Government, Walker is responsible for distributing 200 grams of crack cocaine during the course of the conspiracy between 2007 and 2010," *id.*—

7

although the Government "conservatively estimates that Herron's organization distributed in excess of 1 kilogram of crack cocaine," *id.* ¶ 6. The PSR also noted that, "[b]ased on the instant investigation, post-arrest statements, as well as intelligence provided by confidential informants, agents determined that . . . [Herron's] enforcers[] are responsible for the entire amount of narcotics and firearms involved in this conspiracy, as they were aware of the full scope of this jointly undertaken criminal activity, and the actions of others were reasonably foreseeable to them." *Id.* ¶ 10.

After several delays, Walker's sentencing hearing was scheduled for September 10, 2013.

On the day of the hearing, the District Court—at the Government's request, and over defense counsel's objection—postponed Walker's sentencing until after the trial of Walker's co-defendant, Ronald Herron. *See United States v. Herron*, Docket No. 1:10-cr-00615-NGG-2. At Herron's trial, several witnesses testified about Walker's role in the drug conspiracy: one stated that Walker had said Herron had given Walker "a gun, so he could protect himself," Trial Tr. 2925, June 16, 2014; another testified that Walker served as "muscle" for Herron, Trial Tr. 1724, June 3, 2014; three witnesses said that Walker threatened people to

8

keep them from selling drugs on Herron's turf; and one witness testified that Walker "car[ried a] gun" for Herron, which Walker twice "flashed" in front of the witness, Trial Tr. 2706-14, June 10, 2014. Witnesses also testified that, at the time of Walker's participation in the conspiracy, the organization regularly sold substantial amounts of cocaine.

Walker himself also testified at Herron's trial as a witness for Herron. Walker claimed that he sold drugs only to support himself; denied Herron's involvement in the conspiracy; and stated that Herron was "a positive role model." Trial Tr. 3762-3780, June 23, 2014.

After the *Herron* trial ended, on October 19, 2016, the Government submitted a second sentencing memorandum to the District Court advocating for a "revised" Guidelines sentence for Walker based on allegedly new information that surfaced during Herron's trial. App. 68, 72, 78. Specifically, the Government asserted (1) that the trial testimony established that "a reasonable estimate of the narcotics attributable to [Walker] would be no less than one kilogram of crack-cocaine, which would result in a base-offense level increase to level 32" from 30, *id.* at 80 (citing U.S.S.G. § 2D1.1(c)(4)); (2) that Walker "undoubtedly 'used violence, made a credible threat to use violence, or directed the use of violence'

9

in the commission of the offense, which would result in a two-level upward adjustment of his Guidelines," App. 80 (quoting U.S.S.G. § 2D1.1(b)(2)); and (3) that "given Walker's role as an enforcer in Herron's organization, a two-level upward adjustment, pursuant to [U.S.S.G. §] 3B1.1 is appropriate," App. 80. In addition, the Government argued that Walker's perjurious testimony at Herron's trial warranted a 2-point enhancement for obstruction of justice. App. 78-79 (citing U.S.S.G. § 3C1.1).[1] On this basis, the Government concluded that a Guidelines sentence of 360 months to life in prison was appropriate.

Roughly contemporaneously, Walker's counsel submitted a second sentencing memorandum objecting to the "drastic modification of the original advisory sentencing guidelines" and requesting a *Fatico* hearing. *Id.* 62.[2]

---

[1] The Government also asked that Walker's reduction for acceptance of responsibility be removed and that the enhancement contained in the plea agreement for possession of a dangerous weapon be preserved.

[2] Walker's counsel submitted his second sentencing memorandum on June 14, 2016, in response to an amended PSR that the Probation Department submitted following Herron's trial and in anticipation of a similar submission by the Government. The Probation Department had, in its amended PSR, recommended that Walker's Guidelines sentence be increased following the events at Herron's trial. In Walker's counsel's second sentencing memorandum, counsel objected to the Probation Department's increase from the sentence originally agreed to in his plea agreement, saying that he was "confident" that the Government would similarly advocate for an increased sentence, and arguing that such an increase would also be improper. App. 65. The Government then submitted its second sentencing memorandum on October 19, 2016, arguing for an even higher sentence than that recommended by the Probation Department. Walker's counsel then submitted three supplements to his second sentencing memorandum on April 18, April 24, and May 24, 2017, while maintaining the original substance of his second

Walker's sentencing hearing was finally held on May 30, 2017—six years after he had originally pled guilty. At the hearing, defense counsel objected to each of the Government's additional sentencing enhancements and requested that Walker be sentenced according to the "original guideline range." *Id.* at 116. The Government acknowledged that it had originally advocated for a lesser Guidelines sentence, but explained that "when the plea agreement, the initial plea agreement, was first negotiated in the case, it was a number of years ago." *Id.* at 103. The Government argued that "over the course of [its] investigation, up and through [Herron's] trial, [it] learned loads more information" that justified a new Guidelines sentence. *Id.* The Government further maintained that it was required to "prove a disputed fact relevant to sentencing by a preponderance of the evidence" only, and that "given the quantity of evidence adduced at the trial," it was "totally appropriate for the Court to rely on that [evidence] in making the findings necessary to justify the enhancements." *Id.* at 110.

The District Court agreed that "there [wa]s [a] preponderance of the evidence to" support the Guidelines sentence adopted by the Government. *Id.* at

---

sentencing memorandum. It seems clear from this timeline that Walker's counsel's objections covered the Government's additions.

11

130. The Court then sentenced Walker to 360 months' imprisonment and five years of supervised release. Walker now appeals his sentence.

**DISCUSSION**

Walker appeals on two primary grounds. First, he asserts that the Government breached his plea agreement by advocating for a higher sentence at his sentencing hearing than it had agreed to when he pled. Second, Walker argues that postponement of his sentencing hearing for four years while the Government pursued a trial against his co-defendant violated his Fifth Amendment right to a speedy sentencing. *See United States v. Ray*, 578 F.3d 184 (2d Cir. 2009). Because we find that the Government breached Walker's plea agreement, and vacate the sentence and remand for resentencing on that basis, we do not reach the alleged Fifth Amendment speedy sentencing violation.[3]

**I**

"We review interpretations of plea agreements *de novo* and in accordance with principles of contract law." *United States v. Riera*, 298 F.3d 128, 133 (2d Cir. 2002). "Moreover, because plea bargains require defendants to waive

---

[3] Since Walker, in his Fifth Amendment argument, seeks only the same relief that we are granting him for the Government's breach of the plea agreement, we need not and do not consider the merits of his Fifth Amendment claim.

fundamental constitutional rights, prosecutors are held to meticulous standards of performance." *United States v. Vaval*, 404 F.3d 144, 152-53 (2d Cir. 2005). "[W]e construe plea agreements strictly against the government and do not 'hesitate to scrutinize the government's conduct to ensure that it comports with the highest standard of fairness.'" *Id.* at 152 (quoting *United States v. Lawlor*, 168 F.3d 633, 637 (2d Cir. 1999)).

The Government argues that we should review this claim for plain error because Walker failed to object before the District Court on the specific grounds that the Government "breached" the plea agreement. But if a defendant objects at a sentencing hearing in a manner "which fairly alerts the court and opposing counsel to the nature of the claim," the objection is "sufficient to preserve [the] argument on appeal," even if the defendant fails to "raise a specific rationale for the objection." *United States v. Huggins*, 844 F.3d 118, 121 n.3 (2d Cir. 2016) (quoting *United States v. Sprei*, 145 F.3d 528, 533 (2d Cir. 1998)).

Walker objected multiple times to the Government's change in position. Walker also made clear that he was objecting to the "drastic modification of the original advisory sentencing guidelines," App. 62, and that he ought to be sentenced according to the "original guideline range" contained in his plea

13

agreement, *id.* at 116. Moreover, the Government itself acknowledged, both in its second sentencing memorandum and during Walker's sentencing hearing, that it was changing its position from the Guidelines sentence estimated in Walker's plea agreement. But it argued that such a change was justified because of allegedly new information that it developed against Walker in the course of Herron's trial.

Under the circumstances, it is obvious that Walker's objections, as evidenced by the Government's arguments in response, "w[ere] sufficient to apprise the court and opposing counsel of the nature of [Walker's] claims" regarding the impropriety of the Government's change in position. *Sprei*, 145 F.3d at 533 (internal quotation marks omitted). Therefore, we review the argument that the Government breached Walker's plea agreement for harmless error. *See United States v. Robinson*, 634 F. App'x 47, 49 n.1 (2d Cir. 2016).

**II**

Walker argues on appeal that the Government breached his plea agreement because it (1) advocated for a higher sentence at his sentencing hearing than it had agreed to in his plea agreement, and did so (2) based on information that the Government had in its possession at the time the plea was negotiated. Specifically, Walker contends that the evidence the Government used

14

to support its post-plea base offense level increase, use-of-violence enhancement, and aggravating-role enhancement—*i.e.*, that Herron's organization distributed at least 1 kilogram of crack cocaine, that Walker used violence as part of his role in the drug conspiracy, and that Walker worked as an "enforcer" for Herron—was information that the Government had at the time the plea bargain was struck. Walker contends that the Government's later use of this evidence to justify a revised Guidelines sentence violated the "estimate[]" contained in the plea agreement. App. 90.

Walker concedes that his perjurious testimony on behalf of Herron is new information that the Government did not have in its possession at the time it negotiated his plea agreement. Walker nonetheless argues that the Government's removal of the reduction for acceptance of responsibility and application of an obstruction-of-justice enhancement—both based on this perjury—also violated the terms of his plea agreement. While we will find that the Government breached Walker's plea agreement when it advocated for an increased base offense level, a use-of-violence enhancement, and an aggravating-role enhancement, and, on that basis, vacate Walker's sentence and remand for resentencing, we take no position on whether the enhancements based on

15

Walker's perjury were also improper, and leave that issue to the resentencing court.

**III**

Whether the Government breaches a plea agreement when it later advocates for a higher sentence than that contained in the plea—based on information that the Government knew about at the time the plea was negotiated—is not an unfamiliar issue in this Circuit. *See United States v. MacPherson*, 590 F.3d 215, 218-19 (2d Cir. 2009) (per curiam); *United States v. Habbas*, 527 F.3d 266, 269-72 (2d Cir. 2008); *United States v. Palladino*, 347 F.3d 29, 32-35 (2d Cir. 2003). The issue stems from our suggestion in *United States v. Pimentel*, 932 F.2d 1029, 1034 (2d Cir. 1991), that it would be good practice for the Government to provide pleading defendants with "the likely range of sentences that their pleas will authorize under the Guidelines" (known as a "*Pimentel* estimate") in order to reduce blindsided defendants' claims of "unfair surprise." But this practice has resulted in tension between, on the one hand, defendants' "reasonable reliance" on the sentences as estimated in their plea agreements, and, on the other, the Government's need to maintain flexibility in its sentencing decisions in the event of mistakes, oversights, or new information. *See Habbas*, 527 F.3d at 269-71.

16

As with other questions of breached plea agreements, to resolve this tension, we look both to the precise terms of the plea agreements and to the parties' behavior. We seek to determine what "the reasonable understanding and expectations of the defendant [were] as to the sentence for which he had bargained." *Paradiso*, 689 F.2d at 31. In the specific context of an alleged breached *Pimentel* estimate—because a *Pimentel* estimate is no more than that, an estimate—the Government does not violate a defendant's reasonable expectations simply because it deviates from the estimate. A defendant's reasonable expectations may be breached, however, where the Government's deviation "produce[s] serious unfairness" for the defendant. *Habbas*, 527 F.3d at 271. This may occur if, for instance, the Government acts in bad faith (either in its initial calculation of the *Pimentel* estimate or in its later change of position) or if "the [G]overnment's change of position (without new justifying facts) changed the defendant's exposure so dramatically as to raise doubts whether the defendant could reasonably be seen to have understood the risks of the agreement." *Id.*

Because of this focus on the defendant's reasonable expectations—"rather than technical distinctions in semantics" surrounding the *Pimentel* estimate,

17

*Gammarano v. United States*, 732 F.2d 273, 276 (2d Cir. 1984)—our analysis can produce divergent outcomes in cases that, at first glance, may seem similar. *See MacPherson*, 590 F.3d at 219 (discussing the different outcomes in *Palladino* and *Habbas*). In both *Palladino*, 347 F.3d at 32-33, and *Habbas*, 527 F.3d at 269-70, the defendants alleged that the Government breached their plea agreements by advocating for a higher sentence than that contained in their pleas. The defendants' plea agreements contained similar—though not identical—language in these cases: both agreements stated that the Guidelines sentences in the pleas were "estimate[s]," *Palladino*, 347 F.3d at 33; *Habbas*, 527 F.3d at 270; that these estimates were "not binding" on the Government, *Palladino*, 347 F.3d at 33; *Habbas*, 527 F.3d at 270; and that the defendants were not able to withdraw their pleas if the Government ultimately advocated for an offense level that was "different from the estimate," *Palladino*, 347 F.3d at 33; *Habbas*, 527 F.3d at 270. And in both cases, the Government justified its change in position from the *Pimentel* estimate based on information that the Government knew about at the time the pleas were negotiated. *Palladino*, 347 F.3d at 34; *Habbas*, 527 F.3d at 270.

Yet in *Palladino*, 347 F.3d at 34, we held that the Government breached the plea agreement, while in *Habbas*, 527 F.3d at 270-71, we held it did not.

18

In *Palladino*, the prosecutor who negotiated the plea agreement provided the defendant with a *Pimentel* estimate that excluded a potentially applicable six-point sentencing enhancement. 347 F.3d at 31. Then, when "a new Assistant United States Attorney [took] over the case and adopted a different view of the matter," the Government sought to apply the sentencing enhancement using evidence that the Government knew about at the time the plea was negotiated. *Id.* at 34. The plea agreement specifically stated that the Government's *Pimentel* estimate was "based on information known to [the Government] at [the time of the plea]," *id.* at 33 (emphasis omitted), and that the Government would "make no motion for an upward departure" nor take a position "concerning where within the Guidelines range" the sentence should fall, *id.* Given "the[se] circumstances," we held that the "defendant had a reasonable expectation that the Government would not press the Court for an enhanced offense level in the absence of new information." *Id.* at 34; *see also Habbas*, 527 F.3d at 272 n.1 ("The problem in *Palladino* was . . . the combination of the passages of the plea agreement conferring assurance that the government would not advocate for a sentence higher than the estimate, with the aura of unfair dealing that underlay the government's change of position.").

In *Habbas*, we held that the defendant had no such reasonable expectation. In that case, the Government, "under the pressures of preparing a *Pimentel* estimate after the defendant indicated readiness to plead," simply neglected to "notice the possible applicability of [a four-level sentencing enhancement]." 527 F.3d at 271. When notified by the Probation Department of its oversight, the Government promptly sought to include the enhancement. *Id.* at 270. The *Habbas* defendant's plea agreement included language that the Government "reserve[d] the right to argue for a sentence beyond that called for by the Guidelines," and "clearly stated that the range set forth was merely a non-binding estimate, and warned in several different ways that the government was likely to advocate for a higher sentence." *Id.* The agreement did not, in contrast with *Palladino*, contain the clause, "based on information known to the Government at the time"—or indeed any language indicating that the Government would not advocate for a higher sentence later. *Id.* at 272 n.1. Moreover, the proposed sentencing enhancement ultimately made no difference to the defendant's overall sentence. *Id.* at 271. Under those circumstances, we concluded that the Government did not "violate[] the 'spirit'" of the defendant's plea agreement when it later advocated for a higher sentence. *Id.* at 272 (quoting *Palladino*, 347 F.3d at 30); *see also*

20

*MacPherson*, 590 F.3d at 219 (holding that it was not plain error for the Government to advocate for a higher sentence than the *Pimentel* estimate when it was clear from the language of the plea agreement and the defendant's plea colloquy that the defendant understood that his *Pimentel* estimate was subject to change).

**IV**

Given this framework, we find that Walker's reasonable expectations were violated here. First, as in *Palladino* (and unlike in *Habbas*), Walker's plea agreement contained language indicating that the Government would, "based upon information now known to the Office," "make no motion for an upward departure," and it would change its position only if new information "bec[ame] known to the [Government] after the date of th[e plea] agreement." App. 92-93. The agreement also lacked any language like that in *Habbas* explicitly "reserv[ing] the right" of the Government "to argue for a sentence beyond that called for by the Guidelines." 527 F.3d at 270. "It was thus logical for [Walker] to believe that the [*Pimentel*] estimate, and the Government's stance at the sentencing hearing, would not be altered in the absence of new information." *Palladino*, 347 F.3d at 34.

21

Second, and significantly, the Government's change in position came about in a manner that Walker could not have reasonably expected when he consented to the *Pimentel* estimate, and therefore produced "serious unfairness" for Walker. *Habbas*, 527 F.3d at 271. Walker's sentencing hearing was unexpectedly delayed for four years while the Government put his co-defendant on trial. Then, the Government attempted to increase Walker's sentence on the basis of information that, although also established at the trial, had been well-known to the Government at the time it negotiated Walker's plea. Finally, the Government advocated for a sentence increase that changed Walker's "exposure so dramatically" that we may well question whether he "could reasonably be seen to have understood the risks of the agreement." *Id.* Walker may well have been on notice that his *Pimentel* estimate was subject to change, but he could not have been on notice about this particular degree and kind of change.[4]

---

[4] For two cases that illuminate what is meant by a defendant's "reasonable expectations," compare *United States v. Riera*, 298 F.3d 128, 133-36 (2d Cir. 2002) (Government did not violate defendant's reasonable expectations when it agreed in the plea bargain not to seek an upward departure, but then, in response to a specific request by the district court, explained that the district court would be "well within its discretion in upwardly departing," although the Government repeatedly cautioned it was not advocating for such a departure), with *Vaval*, 404 F.3d at 152-54 (Government breached defendant's reasonable expectations when it agreed not to advocate for an upward departure or a specific Guidelines sentence, then "volunteered highly negative characterizations of [the defendant's] criminal history" and strongly suggested that the district court ought to adopt a higher criminal history category than that contained in the plea).

Despite these problems with Walker's ultimate sentence, the Government argues that it did not breach Walker's plea agreement for two reasons.

First, the Government maintains that Walker's sentence enhancements were based on "new" information, and therefore that it was not bound under the terms of the plea agreement to the original *Pimentel* estimate. Appellee's Br. 51. But—as shown by a straightforward comparison of (a) the October 2010 criminal complaint and the January 2012 PSR with (b) the evidence produced at Herron's trial and enumerated in the Government's October 2016 sentencing memorandum—the information the Government used to justify the increased base offense level, use-of-violence enhancement, and aggravating-role enhancement was in no way new.

*1.* In its 2016 sentencing memorandum, the Government argued that a two-point base offense level increase was justified based on witness testimony at Herron's trial that "a reasonable estimate of the narcotics attributable to [Walker] would be no less than one kilogram of crack-cocaine." App. 80. But the 2012 PSR said that the Government, at that time, already "conservatively estimate[d] that Herron's organization distributed in excess of 1 kilogram of crack cocaine." PSR ¶ 6. The PSR also reported that law enforcement agents had concluded that "enforcers" (as Walker was labeled) "[we]re responsible for the entire amount of narcotics . . . involved in this conspiracy." *Id.* ¶ 10. And the 2010 criminal complaint indicated that Walker was "regularly involved in the distribution of crack cocaine in the Gowanus Houses," Compl. ¶ 6; that the execution of various search warrants resulted in the seizure

23

of "substantial quantities of crack cocaine" from Herron's organization, *id.* ¶ 4; and that Walker himself had already been arrested pursuant to such a search warrant, *id.* ¶ 5.

**2.** In its 2016 sentencing memorandum, the Government contended that a use-of-violence enhancement was appropriate because of witness testimony at Herron's trial that Walker carried a gun and threatened people that they could not sell drugs on Herron's turf. But the 2010 criminal complaint makes clear that the Government knew then that Walker "served as one of Herron's primary security guards and enforcers"; that he "would thus regularly accompany Herron to narcotics transactions and carry firearms for Herron"; that he "would also help to protect Herron's narcotics territory from rival narcotics traffickers and also help to extend Herron's narcotics territory by, for example, robbing or attacking rival narcotics traffickers"; and that he even "participated in a shooting against a rival narcotics trafficker." Compl. ¶ 7. Moreover, the 2012 PSR also described Walker as "an enforcer" who "carried a firearm as part of his role in the organization in order to protect himself, the drug proceeds, and the locations on the block where the crack cocaine was sold." PSR ¶ 11.

**3.** In its 2016 sentencing memorandum, the Government asserted that a two-point aggravating-role enhancement was appropriate "given Walker's role as an enforcer in Herron's organization." App. 80. But again, both the 2010 criminal complaint and the 2012 PSR specifically characterized Walker as an "enforcer." Compl. ¶ 7; PSR ¶ 11.

There is little daylight between the information that the Government adduced in Walker's 2016 sentencing memorandum and that contained in the criminal complaint and the 2012 PSR. And the Government essentially admits as

24

much, conceding in its brief on appeal that while it may have had similar information on Walker earlier, it was not "actionable" at the time the Government drafted Walker's plea agreement. Appellee's Br. 53. Actionable or not, the Government knew about Walker's activities and, based on that, made the conscious choice to exclude certain enhancements from Walker's plea agreement.[5] Having made that determination, and bargained on that basis with Walker in return for his guilty plea, the Government yielded much of its freedom to incorporate those enhancements later. *See Palladino*, 347 F.3d at 34; *Santobello v. New York*, 404 U.S. 257, 262 (1971) ("[W]hen a plea rests in any significant degree on a promise or agreement of the prosecutor, so that it can be said to be part of the inducement or consideration, such promise must be fulfilled.").

Second, the Government argues that it did not breach Walker's plea agreement because, contrary to Walker's assertions, the Government did not act

---

[5] Indeed, the consciousness of the Government's choice is demonstrated by its treatment of the Section 2D1.1(b)(1) enhancement for possession of a weapon, which (unlike the other enhancements at issue here) the Government chose to include in Walker's original plea agreement. The Government now explains to us that the Section 2D1.1(b)(1) enhancement was based on similarly non-actionable information, and that at the time of the plea, Walker had a "credible argument" that it should not have applied. Appellee's Br. 53 n.8. Yet the Government chose to incorporate the Section 2D1.1(b)(1) enhancement in Walker's *Pimentel* estimate anyway—and, *a fortiori*, to exclude others. It is precisely that calculation that Walker consented to in his *Pimentel* estimate and that he could reasonably expect would be upheld by the Government.

25

in bad faith. But we need not find that the Government acted in bad faith in order to hold that Walker's reasonable expectations were violated. Of course, it is "obvious[ly] importan[t]" for the Government to act in good faith when it negotiates a plea agreement, and evidence to the contrary is a strong indicator that the Government violated a defendant's reasonable expectations. *Habbas*, 527 F.3d at 272. But bad faith is not the only factor relevant to an inquiry into whether the Government breaches an agreement by deviating from a *Pimentel* estimate. "[T]he number of significant variables potentially in play in such an inquiry is enormous." *Id.* In this case, all the variables lead us readily to conclude that Walker's ultimate sentence did not fall within the range of what he reasonably could have expected given the *Pimentel* estimate contained in his plea agreement and the circumstances under which the Government's estimate changed. Those circumstances on their own produced "serious unfairness" for Walker, *id.* at 271, and, therefore, we need not reach Walker's allegations that the Government did, indeed, act in bad faith.

**V**

The Government further argues that, even if it did breach Walker's plea agreement, Walker cannot show that he suffered any harm from the breach. That argument lacks merit. There is no doubt that the District Court relied on the

26

Government's improperly "revised" Guidelines sentence calculation in imposing Walker's ultimate sentence. And the Supreme Court has instructed that "the [district] court's reliance on an incorrect range in most instances will suffice to show an effect on the defendant's substantial rights." *Molina-Martinez v. United States*, 136 S. Ct. 1338, 1347 (2016). "Indeed, in the ordinary case a defendant will satisfy his burden to show prejudice by pointing to the application of an incorrect, higher Guidelines range and the sentence he received thereunder. Absent unusual circumstances, he will not be required to show more." *Id.* We therefore conclude that the Government's breach of Walker's plea agreement was harmful error which requires correction.

**VI**

"In general, the remedy for a breached plea agreement is either to permit the plea to be withdrawn or to order specific performance of the agreement." *Vaval*, 404 F.3d at 154 (internal quotation marks and brackets omitted) (quoting *United States v. Brody*, 808 F.2d 944, 947 (2d Cir. 1986)). "[T]he choice between the remedies of resentencing or plea withdrawal 'is generally a discretionary one guided by the circumstances of each case.'" *Vaval*, 404 F.3d at 156 (quoting *Palladino*, 347 F.3d at 34). In cases where specific performance is the appropriate remedy, we typically remand the case for resentencing before a different district

27

judge because "[t]he effect of the government's breach of its commitment is difficult to erase" and "it is likely that the same judge would reach the same result as he reached before." *United States v. Enriquez*, 42 F.3d 769, 772 (2d Cir. 1994). But "where resentencing before another district judge would not cure the taint caused by a government breach . . . we have held that plea withdrawal was the appropriate remedy." *Vaval*, 404 F.3d at 156 (internal quotation marks, alterations, and citation omitted).

In this case, we believe that the appropriate remedy is to order specific performance of the agreement. In *Palladino*, another case of a breached *Pimentel* estimate, we concluded that plea withdrawal was the correct remedy because the agreement itself was "hopelessly tainted by the introduction of new evidence known to the Government at the time of the plea." 347 F.3d at 35. The same is true here. But as we recognized in *Palladino*, the result of such a withdrawal could be "a conviction on remand that carries a longer sentence than that initially imposed." *Id.* If a new plea agreement cannot be negotiated, Walker could be tried and convicted, and the sentencing judge could elect to impose a sentence higher than that estimated in Walker's plea agreement. Given that risk, and the fact that Walker specifically requested resentencing as opposed to withdrawal of

28

his plea agreement on appeal, we think it appropriate to order specific performance of Walker's plea agreement.

**CONCLUSION**

For the foregoing reasons, we **VACATE** the judgment and **REMAND** to the District Court for resentencing. We do not doubt Judge Garaufis' capacity to resentence Walker appropriately. But given our holding on the appropriate remedy in the event of a Government breach in *Enriquez* and in all of the plea agreement violation cases we have found,[6] we deem it appropriate to have the resentencing be before a different district judge.

---

[6] *See, e.g.*, *Vaval*, 404 F.3d at 156; *United States v. Griffin*, 510 F.3d 354, 369 (2d Cir. 2007); *United States v. Lawlor*, 168 F.3d 633, 638 (2d Cir. 1999); *United States v. Gaviria*, 49 F.3d 89, 92 (2d Cir. 1995); *United States v. Carbone*, 739 F.2d 45, 48 (2d Cir. 1984); *United States v. Corsentino*, 685 F.2d 48, 52 (2d Cir. 1982).